IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Francine M. Tomlinson, | : | |
| Personal Representative for | : | |
| the Estate of George W. Tomlinson, Jr., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Checkpoint Systems, Inc., | : | No. 06-2205 |
| Defendant. | : | |

**MEMORANDUM AND ORDER**

G<span>ENE</span> E.K. P<span>RATTER</span>, J.                                                                                  J<span>ANUARY</span> 23, 2008

George W. Tomlinson, Jr. commenced this action on April 21, 2006 against his former employer Checkpoint Systems, Inc. ("Checkpoint") alleging breach of contract, promissory estoppel, and violations of the Pennsylvania Wage Payment and Collection Law ("WPCL") (43 P.S. §260.1 et. seq.). Mr. Tomlinson claimed that Checkpoint terminated his employment without cause and then failed to pay bargained-for severance. Mr. Tomlinson died suddenly a year ago, and his estate ("Plaintiff"), as represented by Francine M. Tomlinson, now is pursuing the litigation.

Both parties now seek summary judgment. For the reasons set forth below, the Court will deny Plaintiff's Motion in its entirety, grant Checkpoint's Motion with respect to Counts II (promissory estoppel) and III (WPCL), and deny Checkpoint's Motion with respect to the breach of contract claim alleged in Count I.

I.      FACTUAL BACKGROUND

Checkpoint manufactures and markets "technology-driven integrated solutions that facilitate the merchandising, tracking and securing of consumer goods at key checkpoints in the supply chain." (Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment ("SUF-D") ¶ 1.) Checkpoint is incorporated in the Commonwealth of Pennsylvania, but has no offices in Pennsylvania. Its principal place of business is in Thorofare, New Jersey. (SUF-D ¶ 2.)

George Tomlinson Jr. began working with Checkpoint as a consultant in fall 2003. (Plaintiff's Brief in Support of Motion fo Summary Judgment, Relevant Facts ("RF-P") ¶ 5.) During spring 2004, Mr. Tomlinson started employment negotiations with Thomas Upshur, then Vice President and General Manager for Checkpoint's ID Products and Emerging Business Divisions. (SUF-D ¶ 3.) Plaintiff maintains that Checkpoint sought to hire Mr. Tomlinson because his consulting fee was more expensive for the company than would be his salary as an on-staff employee. (RF-P ¶ 7.) Mr. Upshur had the authority to negotiate with Mr. Tomlinson, but had to obtain final approval from John Davies regarding the terms of any offer. (RF-P ¶ 10.)

On April 15, 2004, Mr. Upshur sent an email to Mr. Davies asking whether he could offer Mr. Tomlinson an employment contract and noting that Mr. Tomlinson was "concerned about continued funding for all three of the product lines and looking for some security in the event of a major change in strategy." (RF-P ¶ 19.) Mr. Davies responded by email: "I have no issue with Doug Karp style 9 month Contract [sic]." (RF-P ¶ 20.)

A month later, on May 14, Mr. Upshur sent Mr. Davies an email seeking authority to

offer Mr. Tomlinson a position as a "permanent employee" with Checkpoint. (Plaintiff's Motion for Summary Judgment ("MSJ-P"), Ex. 10.) The email referenced a nine-month, senior director employment contract. Id. The same day, Mr. Davies approved the terms of a proposed offer letter for Mr. Tomlinson. (RF-P ¶ 24.) See (MSJ-P, Ex. 11.)

In a letter dated June 2, 2007, Mr. Upshur offered Mr. Tomlinson the position of Senior Director – Research & Development for the ID Products Group. (Defendant's Motion for Summary Judgment ("MSJ-D"), Ex. C ("offer letter").) The letter stated: "You will also have the option of signing Checkpoint's standard employment contract for your level which covers a variety of severance and termination issues." Id. Mr. Tomlinson executed the letter June 4, 2004. (SUF-D ¶ 9.) He began working out of Checkpoint's New Jersey office on June 7, 2004. (SUF-D ¶ 10.)  Plaintiff claims that Mr. Tomlinson delivered a hard copy memorandum to Mr. Upshur on June 7, 2007, stating that Mr. Tomlinson had not yet received a copy of the "Employee Severance Contract Agreement." (RF-P ¶ 30.)

On or before June 20, 2004, Carol Welsh, legal assistant to Checkpoint's in-house counsel, prepared a standard employment contract for Mr. Tomlinson, which included a severance package and a non-compete clause. (SUF-D ¶ 15.) Mr. Tomlinson had provided his address to Ms. Welsh to use on the contract. (RF-P ¶ 33.) Ms. Welsh last saved the contract document on her computer June 20, 2004 at 10:46 a.m. (RF-P ¶ 34.)  She testified in her deposition that she hand-delivered two copies of the employment contract to Mr. Upshur to give to Mr. Tomlinson. (MSJ-P, Ex. 15 at pp. 9-10.)

Mr. Upshur does not remember Mr. Tomlinson asking him for a copy of the employment contract. (RF-P, Ex. 5 at 29.) He also has no recollection of receiving a copy of Mr. Tomlinson's

employment contract from Ms. Welch. (RF-P, Ex. 5 at 35-36) ("I don't recall ever receiving one. But it would not be common for me to receive it. I don't recall having copies of anyone's documents other than my own.")

Checkpoint informed Mr. Tomlinson in mid-January 2005 that as a result of a department-wide lay-off, his employment would be terminated. (SUF-D ¶ 11.) Mr. Tomlinson contacted his direct supervisor, Farrokh Abadi, by letter on January 25, 2005 requesting to execute the employment contract referenced in his offer letter. (SUF-D ¶¶ 12-13.) Noting that Mr. Tomlinson had not signed the employment contract with the nine-month severance package, Checkpoint offered Mr. Tomlinson four months of severance benefits. (SUF-D ¶ 24.)

Mr. Tomlinson sent a letter via email to David Doonan, Checkpoint's then-President and CEO, on January 27, 2005. See, (MSJ-P, Ex. 21.) In the letter, Mr. Tomlinson stated that while he (Mr. Tomlinson) was promised the opportunity to sign the standard employment contract, he had never been given a copy of the contract. Id. at 2 ("I believe that the signed offer letter I received and e-mails are a sufficient commitment from the company for follow through on the contract. I never anticipated that the company would back away from its commitment to allow me to execute the contract, but that is where we are now.")

Mr. Tomlinson sent a second letter via email to Mr. Doonan on January 31, 2005. See (MSJ-D, Ex. D.) This letter stated, in part:

> I simply want what was committed in my offer letter, which is executing the standard Checkpoint contract with a nine month severance arrangement....Incidentally, the contract we are talking about executing also provides non-compete provisions for Checkpoint, which I am not currently obligated to comply with since the contract has not been signed. Timeliness of finalizing the contract would therefore seem to be important for all involved parties....Please help the company follow through on the commitments they

>       originally made to me. I have always been prepared to sign the agreement and
>       follow through.

Id.

Mr. Tomlinson never signed the employment contract and was not paid severance after he was laid off on January 28, 2005. (RF-P ¶¶ 48-49.)  He remained unemployed until September 2005 when he accepted a position with Starcite Corporation. (RF-P ¶¶ 53-55.)  Mr. Tomlinson died suddenly on January 18, 2007. (RF-P ¶ 56.)  His estate is now pursuing the lawsuit.

**II.    LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©.  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A factual dispute is "material" if its resolution might affect the outcome of the case under governing law. Id.

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions. Southeastern Pa. Transit Auth. v. Pennsylvania Pub. Util. Comm'n, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993).

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Where the non-moving party bears

the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

### III. DISCUSSION

#### A. Breach of Contract

##### 1. The necessity of a written contract

Both parties acknowledge that Mr. Tomlinson never signed an employment contract with Checkpoint.  However, Mr. Tomlinson's estate urges the Court to find that he had a valid *oral* contract with Checkpoint even though he did not sign a printed contract. Checkpoint maintains that because both parties knew their agreement had to be reduced to a signed writing to be valid, Mr. Tomlinson's failure to sign a printed employment contract prevented the contract from binding either party.  Checkpoint urges the Court to ignore Mr. Tomlinson's employment negotiations and focus only on the wording of his offer letter and draft employment contract.

Parties form a valid contract when they "1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." <u>Weaverton Transp. Leasing, Inc. V. Moran</u>, 834 A.2d 1169, 1172 (Pa. Super. 2003). For an enforceable contract to exist, the parties must have a "meeting of the minds" as demonstrated by the offer and acceptance. <u>Mountain Props v. Tyler Hill Realty Corp.</u>, 767 A.2d 1096, 1101 (Pa. Super. 2001). Consideration consists of either "a benefit to the promisor or a detriment to the promisee." <u>Weaverton</u>, 834 A.2d at 1172.  A party may accept an offer through conduct alone, but any such conduct should be judged on the "basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." <u>Id</u>. (citations omitted).

Defendant Checkpoint highlights three facts in arguing that Mr. Tomlinson never had a valid employment agreement with the company and did not view himself as bound by any of the agreement's terms – positive or negative. First, as the parties agree, Mr. Tomlinson never signed the employment agreement. Second, Mr. Abadi, Mr. Tomlinson's manager at the time of his termination, testified in his deposition that Mr. Tomlinson "acknowledged to me that he had received an E-mail [sic], that he did have the contract....There was no issue of fact that he didn't have the contract."  (MSJ-D, Ex. A at 11).[1]  Third, on January 31, 2005, just days after his termination, Mr. Tomlinson sent an email to Checkpoint's then-President and CEO, David

---

[1]Plaintiff has challenged this testimony as hearsay evidence that is inadmissible during the summary judgment phase.  Checkpoint rightly asserts in a Supplemental Memorandum of Law (Docket No. 30), filed October 18, 2007, that statements made by Mr. Tomlinson to Mr. Abadi constitute admissions by a party-opponent and, therefore, may be properly considered by the Court.  <u>See</u>, Fed. R.Evid. 801(d)(2)(A) (defining an admission by a party-opponent to include any "statement offered against a party [that] is (A) the party's own statement in either an individual or representative capacity.")

Doonan, acknowledging that he had not signed the employment contract and thus was not bound by the non-compete limitations. See, (MSJ-D, Ex. D.)

Checkpoint argues that any discussions or email exchanges Mr. Tomlinson may have had with Mr. Upshur prior to his hiring are immaterial to the issues at hand. Defendant looks to the Restatement (Second) of Contracts for support:

> [I]f either party [to the contract] knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts, § 27. "Existence of Contract Where Written Memorial is Contemplated." Checkpoint argues that when "parties contemplate that their agreement cannot be considered complete before it is reduced to writing, no contract exists until execution of a written agreement." (SJM-D at 8.)  See, Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 699 A.2d 1324, 1329 (Pa. Commw. 1997) ("Where however the parties contemplate that their agreement cannot be considered complete before it is reduced to writing, no contract exists until the execution of the writing.")[2]

Plaintiff counters that both Mr. Tomlinson and Checkpoint sought to reach an agreement about Mr. Tomlinson's employment. (MSJ-P at 12.)  Checkpoint wanted to lower its costs by converting a consultant into a full-time employee because internal employees are paid less. Mr. Tomlinson wanted the security of a full-time position with the company and, in particular, the

---

[2]Checkpoint also cites Storms v. O'Malley, 779 A.2d 548, 2001 PA Super. 184 (Pa. Super. 2001).  However, Storms is not precisely on point. That case holds that even when parties intend to reduce an agreement to writing, if they agree on essential terms and intend to be bound, a valid contract is formed. Id. at 557. Intent is a question of fact. Id.  As such, the Court may not make a determination regarding the parties' intent in this case.  A jury must make any such determination.

security of a guaranteed severance package. Id. The parties reached a meeting of the minds when Mr. Tomlinson was given an offer letter, signed the letter, began work at Checkpoint, and, on his first day, reminded his supervisor that he still needed a copy of the employment contract guaranteeing severance. Id. at 14.

A writing is not required in every case for valid contract formation. Once there is an offer, acceptance and exchange of consideration, a "contract is formed even if the parties intend to reduce their agreement to a single writing with additional terms at a later date." Yocca v. Pittsburgh Steelers Sports, Inc., 806 A.2d 936, 942 (Pa. Commonw. 2002). In fact,

> where the parties have agreed orally to all the terms of their contract, and a part of the mutual understanding is that a written contract embodying these terms shall be drawn and executed by the respective parties, such oral contract may be enforced, though one of the parties thereafter refuses to execute the written contract.

Ketchum v. Conneaut Lake Co., 163 A. 534, 535 (Pa. 1932) (citations omitted) (quoted in Good v. Pennsylvania Railroad Co., 263 F. Supp. 84, 86 (E.D.Pa. 1967)).

Defendant Checkpoint counters these arguments by asserting that the signing of the writing, the employment contract, is not a "mere formality," but instead is "an express condition precedent for the payment of nine months severance to Plaintiff." (Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment at 5). The parties had a mutual understanding only that Mr. Tomlinson would receive a written employment contract which he could sign (thus accepting its restrictions and benefits) or ignore (and avoid its restrictions and benefits).

The evidence presented at this point in the litigation does not sufficiently establish for purposes of summary judgment that either (1) Mr. Tomlinson received the employment contract

9

but, for some reason, did not sign it or (2) Checkpoint withheld the employment contract from Mr. Tomlinson, thus preventing him from signing a document he always intended to sign.

### 2. Reasonable Acceptance Period

Assuming that Mr. Tomlinson's June 2, 2004 offer letter contained an enforceable promise, Defendant Checkpoint argues that the time for accepting the employment contract lapsed prior to Mr. Tomlinson's termination and certainly prior to his ensuing request to sign the document. Mr. Tomlinson's unreasonable delay in accepting the company's offer prohibits his recovery under a breach of contract theory, according to the company. Plaintiff maintains that the offer was never withdrawn and thus remained open through Mr. Tomlinson's termination date.

When "an offer does not specify an expiration date or otherwise limit the allowable time for acceptance, it is both hornbook law and well established in Pennsylvania that the offer is deemed to be outstanding for a reasonable period of time." Vaskie v. West American Insurance Co., 383 Pa. Super. 76, 81 (Pa. Super. 1989) (internal citations omitted). Reasonableness depends on numerous factors, including "the nature of the contract, the relationship or situation of the parties and their course of dealing, and usages of the particular business." Id.

The determination of what constitutes reasonable time is generally a question of fact for the jury. Vaskie, 383 Pa. Super. at 81. However, in situations where "there can be no question of doubt as to the proper answer to the question," the reasonable period for acceptance may be determined by the court as a matter of law. Id. (quoting Boyd v. Merchants & Farmers Peanut Co., 25 Pa. Super. 199, 205). The Boyd opinion granted courts the power to make such a

determination as a matter of law only for transactions which occur regularly and always in the same manner. 25 Pa. Super at 205 (discussing commercial transactions and contracts to purchase merchandise in a volatile market). When the issue of reasonableness is "dependent on many different circumstances, which do not continually recur in other cases of like character, and with respect to which no certain rule of law could be laid down, the question is one of fact for the jury." Id.  Unlike standardized commercial transaction contracts, employment contracts vary greatly between different companies and often among employees of the same company.  As such, the reasonableness of an acceptance period for Mr. Tomlinson's employment contract must be left to the jury.

### B.     Promissory Estoppel

Plaintiff argues that even if there was no valid employment contract between Mr. Tomlinson and Checkpoint, Plaintiff should prevail under the doctrine of promissory estoppel. Through the doctrine of promissory estoppel, a promise that is not supported by consideration may be enforced by the courts to "remedy a manifest injustice." Cardamone v. University of Pittsburgh, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978). Promissory estoppel should not be used to supplement or modify a written, enforceable contract. The doctrine applies in situations where parties failed to satisfy the "formal requirements of contract formation...and where justice would be served by enforcing a promise." Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 416 (3rd Cir. 1990). Thus, by definition, a promissory estoppel claim can survive only where a contract is absent. Iverson Baking Co., Inc. V. Weston Foods, Ltd., 874 F.Supp. 96, 102 (E.D.Pa. 1995) ("[I]f the courts finds that a contract exists, the promissory estoppel claim must fail.")

Promissory estoppel is "an equitable remedy to be implemented only when there is no contract; it is not designed to protect parties who do not adequately memorialize their contracts in writing." Iversen Baking Co. v. Weston Foods, Ltd., 874 F. Supp. 96, 102 (E.D. Pa. 1995).

In defining promissory estoppel, the Restatement (Second) of Contracts §90.1 states that a "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Under Pennsylvania law:

> In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.

Crouse v Cyclops Indust., 745 A.2d 606, 610 (Pa. 2000). A party asserting estoppel must establish these three elements "by clear, precise and unequivocal evidence." Blofsen v. Cutaiar, 460 Pa. 411, 417 (Pa. 1975) (citations omitted).

Plaintiff argues for protection under the doctrine of promissory estoppel based on Mr. Tomlinson's insistence on receiving guaranteed severance prior to converting from an outside consultant to an internal employee. (MSJ-P at16.) Checkpoint promised to give Mr. Tomlinson the opportunity to sign an employment contract including severance pay, and Mr. Tomlinson relied on that promise when he accepted a position with the company. Plaintiff argues that injustice can be avoided only by enforcing the promised severance agreement.

Plaintiff asserts that Mr. Upshur, the person who negotiated Mr. Tomlinson's employment with the company, believed that Mr. Tomlinson would refuse the offer without a

guaranteed severance provision. Therefore, he, on behalf of Checkpoint, promised Mr. Tomlinson an employment contract that included a guaranteed severance pay. Plaintiff maintains that Mr. Tomlinson relied on the promise of severance when he accepted employment with Checkpoint, but later was prevented from signing the required employment contract. Id. at 16-17. As such, in Plaintiff's view, Mr. Tomlinson's reliance on Mr. Upshur's assurances about his right to sign the employment contract requires the Court to find for Plaintiff under the doctrine of promissory estoppel if the Court does not find for Plaintiff under the breach of contract claim.

Defendant Checkpoint argues that the doctrine of promissory estoppel does not apply in this case because Mr. Tomlinson failed to establish even one element of the three-part test for promissory estoppel. According to Checkpoint, Mr. Tomlinson accepted at-will employment with Checkpoint by signing his offer letter and thereafter consciously chose not to execute the employment contract containing a non-compete provision. (MSJ-D at 10.) Checkpoint also maintains that Mr. Tomlinson did not detrimentally rely on any alleged promises because he had no other employment opportunities at the time he began working for Checkpoint. Finally, Checkpoint argues that even if Mr. Tomlinson intended to sign the employment agreement, he made no attempt to do so until after learning of his termination. Id. at 12-13. Checkpoint urges that Mr. Tomlinson not be allowed protections under the doctrine of promissory estoppel because he failed to execute a once-valid contract and thus officially protect his rights.

Because an issue of material facts remains as to whether Mr. Tomlinson received his employment contract, the Court looks to the second element of promissory estoppel for resolution: detrimental reliance. See, Payne v. RCA Corp., 868 F.2d 631, 638 (3d Cir. 1989) ("Liability based on promissory estoppel requires proof of representation and of reasonable

13

detrimental reliance on that representation.") Checkpoint rightly notes that Plaintiff has failed to present evidence that Mr. Tomlinson detrimentally relied on any promises allegedly made during his employment negotiations. Plaintiff has presented no evidence that Mr. Tomlinson abandoned other employment opportunities to accept his position with Checkpoint or otherwise was disadvantaged by accepting a position with the company. See, Yeomans v. W.H. Newbold's Son & Co., 1989 U.S. Dist. LEXIS 9140 (E.D. Pa. August 4, 1989) (granting summary judgment for the defendant where the plaintiff failed to establish that he forewent other employment opportunities in detrimental reliance on the defendant's alleged promises). See also, Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d 1990) ("unsupported allegations ... and pleadings are insufficient to repel summary judgment"). Based upon this evaluation, the remaining material issues concerning contract formation are not relevant to any open legal issue.

Mr. Tomlinson's estate may not seek redress under a promissory estoppel claim because the estate has presented no proof that Mr. Tomlinson detrimentally relied on any promise made by Checkpoint.

### C.     Pennsylvania Wage Payment and Collection Law

Mr. Tomlinson's estate asserts that Mr. Tomlinson was entitled protection under the Pennsylvania Wage Payment and Collection Law (43 P.S. §260.1 et. seq.) ("WPCL") because Checkpoint is a Pennsylvania employer under the statute and, as such, is bound by its requirements. Checkpoint maintains that Mr. Tomlinson was not an employee under the law, so his estate cannot seek WPCL protections regardless of Checkpoint's status. Checkpoint also argues that regardless of Mr. Tomlinson's employment status, this law cannot apply to his case

because he never had a valid severance agreement to enforce under the WPCL.

The WPCL does not create an independent basis for recovery. Instead, the legislation provides a statutory remedy for an employer's breach of an established contractual obligation to pay wages and other related benefits. See, Sendi v. NCR Comten, Inc., 619 F.Supp. 1577, 1579 (E.D. Pa. 1985) ("The statute itself does not create a right to compensation."). See also, Utener v. Hoag, 697 F.Supp. 196, 197 (W.D. Pa. 1988) ("The purpose of the WPCL is to permit employees to enforce agreements with their employers to pay wages and fringe benefits.") As a result, if a court does not find that a plaintiff had a valid contract with a defendant employer, then the WPCL will not apply. Without a valid employment contract between Mr. Tomlinson and Checkpoint, Plaintiff cannot pursue a claim under the WPCL. Issues of material fact remain concerning whether Mr. Tomlinson had a valid employment contract, but the Court's analysis of this claim does not stop here.

Assuming, for the moment, that Mr. Tomlinson did have a valid employment contract with Checkpoint, the analysis of Plaintiff's WPCL claim requires additional consideration. The estate argues that the analysis of the claim should focus on whether Checkpoint was a Pennsylvania "employer" under the law, but case law from this District explains otherwise.

Simply proving that a company employs at least one person within Pennsylvania establishes it as an "employer" under the plain language of the WPCL. See, 43 P.S. §260.2(a) ("'Employer.' Includes every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth."). Under such a definition, Checkpoint might be considered a Pennsylvania employer under the WPCL if it did employ sales persons

who worked from their homes in the state, as alleged by Plaintiff.

In order to establish a right to statutory protections under the WPCL, though, the estate must prove that Mr. Tomlinson was an "employee" entitled to the law's protections. In <u>Killian and Grossberg v. Donald McCulloch Jr., et al</u>, 873 F. Supp. 938 (E.D.Pa. 1995), the court expressly rejected the plaintiffs' argument that "the WPCL was enacted to regulate the conduct of those who employ persons within Pennsylvania." <u>Id.</u> at 942. Here, as in <u>Killian</u>, the law in question was passed to "protect employees." The Pennsylvania "legislature has a strong interest in enacting legislation to protect those who work in the Commonwealth, but has almost no interest in extending that protection to those who work outside Pennsylvania." <u>Id</u>. The court held that "protections contained in the WPCL extend only to those *employees* based in Pennsylvania." <u>Id</u>. (emphasis added).

The only issue left unresolved by <u>Killian</u> is whether the WPCL should apply to Pennsylvania residents who are employed by out-of-state employers and whose positions are based out of state. The language in <u>Killian</u> quoted above suggests that it should not; however, <u>Killian</u> dealt with plaintiffs who both lived and worked outside Pennsylvania. <u>Id</u>. at 941.  The <u>Killian</u> plaintiffs' claim for relief under the WPCL relied solely on the fact that their employer allegedly employed other employees within the Commonwealth and thus could be considered a Pennsylvania employer under the WPCL. The court exposed the unworkability of such an idea that residents from other states might be able to sue their out-of-state employers under the WPCL merely because those employers employed other, unrelated people to conduct business within Pennsylvania. <u>Id</u>. at 942. ("A literal reading of the statute would, for example, allow an Arizona-based employee to bring a WPCL claim against his Oregon-based employer as long as that

company also employed one person based in Pennsylvania.")[3]

Tucci v. Kelco Aps & Lehman Bros., Inc., 2002 U.S. Dist. LEXIS 19232, (E.D.Pa. 2002), bears a close relation to the suit presently before the Court. In Tucci, the court dismissed a WPCL claim brought by a plaintiff who lived in Pennsylvania, received paychecks in the Commonwealth, and occasionally worked from his Pennsylvania home. Id. at *6. The court found that Mr. Tucci "was based in Delaware because he was employed as the CEO of a company located in Delaware under an employment contract with a Delaware choice of law clause. Id. at *7. Like Mr. Tucci, Mr. Tomlinson was a Pennsylvania resident who worked in another state for a company based in that state. Mr. Tomlinson allegedly worked from home on occasion, but as in the Tucci opinion, the Court concludes that limited or incidental telecommuting does not trigger application of the WPCL. See, id. at *7-8.

Plaintiff cites Dean v. Handysoft Corp., 2005 U.S. Dist. LEXIS 2127 (E.D. Pa. 2005), as support for the argument that telecommuting from a Pennsylvania home nonetheless could trigger WPCL application. However, Dean involved a Virginia employer that reimbursed the employee for the creation of a home office in Pennsylvania and assigned the employee to work with clients based in Pennsylvania. Id. at *1. Here, in contrast, Mr. Tomlinson had no professional responsibilities on behalf of Checkpoint in Pennsylvania and did not make arrangements with his employer to consistently work from home. In addition, in Dean, the court's analysis focuses on the applicability of the Pennsylvania Human Rights Act, not the

---

[3]As in Killian, the court in Hides v. Certainteed Corp., 1995 U.S. Dist. LEXIS 10849 (E.D. Pa. 1995), dismissed a plaintiff's case because he failed to allege he was employed by the defendant in Pennsylvania. Id. at *5 ("[I]t seems clear that, under the Wage Payment and Collection Law, the plaintiff must allege that he was employed in the Commonwealth of Pennsylvania.").

WPCL. In fact, Dean includes no analysis of the WPCL. Thus, the Court concludes that Dean provides no compelling instruction for resolving this case.

In any event, whether Checkpoint would be considered a Pennsylvania employer under the WPCL is not the issue. Rather, the question is whether Mr. Tomlinson was a Pennsylvania employee under the statute. He was not, and thus, is not entitled to its protections.

**IV. CONCLUSION**

Even when viewed in the light most favorable to Mr. Tomlinson's estate, the evidence does not support the conclusion that Mr. Tomlinson detrimentally relied on promises made by Checkpoint during employment negotiations. Because Mr. Tomlinson was not an employee under the WPCL, he is not entitled to its protection. However, issues of material fact remain as to alleged breach of contract. Therefore, Plaintiff's Motion for Summary Judgment is denied in its entirety. Checkpoint's Motion for Summary Judgment is granted with respect to Count II (promissory estoppel) and Count III (WPCL), but denied as to Count I (breach of contract).

An appropriate Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Francine M. Tomlinson, | : | |
| Personal Representative for | : | |
| the Estate of George W. Tomlinson, Jr., | : | CIVIL ACTION |
|     Plaintiff, | : | |
|     v. | : | |
| | : | |
| Checkpoint Systems, Inc., | : | No. 06-2205 |
|     Defendant. | : | |

**ORDER**

AND NOW, this 23rd day of January 2008, upon consideration of Plaintiff's Motion for Summary Judgment (Docket No. 21), Defendant's Motion for Summary Judgment (Docket No. 22), Plaintiff's Response in Opposition (Docket No. 23), Defendant's Response in Opposition (Docket No. 26), Defendant's Supplemental Memorandum (Docket No. 30), and Plaintiff's Supplemental Brief (Docket No. 31), the Court HEREBY ORDERS that:

1) Plaintiff's Motion for Summary Judgment is DENIED in its entirety.

2) Defendant's Motion for Summary Judgment is GRANTED as to Claims II (promissory estoppel) and III (Pennsylvania Wage Payment and Collection Law), but DENIED as to Claim I (breach of contract).

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge